UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| S/Y PALIADOR, LLC,<br><br>                         Plaintiff,<br><br>        v.<br><br>PLATYPUS MARINE, INC.,<br><br>                         Defendant. | **IN ADMIRALTY**<br><br>CASE NO. 3:22-cv-05591-LK<br><br>ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT |

Before the Court is Defendant Platypus Marine, Inc.'s Motion for Summary Judgment. Dkt. No. 31. Plaintiff S/Y Paliador, LLC opposes the motion. Dkt. No. 36. For the reasons set forth below, the Court grants the motion in part and denies it in part.[1]

## I.    BACKGROUND

**A.    Paliador Brings the Vessel to Platypus for Maintenance**

Paliador is the former owner pro hac vice of the 102-foot sailing yacht S/Y PALIADOR ("PALIADOR" or the "vessel") pursuant to a May 2021 demise charter party—also referred to as

---

[1] Because the Court can decide this motion based on the parties' briefing, it denies Paliador's request for oral argument. Dkt. No. 36 at 1.

1  a bareboat charter[2]—with AMIkids, Inc. Dkt. No. 40 at 1–2, 10–40; *see also* Dkt. No. 33-1 at 5.[3]

2  Paliador member Edward Roach co-owned and managed the vessel, and Tim Forderer served as

3  its captain beginning in May 2021 through the period relevant to this dispute. Dkt. No. 33-1 at 4;

4  Dkt. No. 38 at 2; Dkt. No. 40 at 1–2, 6.

5          In the fall of 2021, Roach and Forderer discussed "taking the PALIADOR into a shipyard

6  for elective and proactive maintenance work, including renewal of the anti-fouling paint below the

7  waterline." Dkt. No. 40 at 2. The two decided on Platypus Marine, a full-service shipyard located

8  in Port Angeles, Washington, based on Forderer's research as well as Platypus's expertise. *Id.*; *see*

9  *also* Dkt. No. 38 at 2. Forderer reached out by telephone to Platypus, and on December 13, 2021,

10  Platypus's sales manager Amanda Kennedy emailed Forderer a cost estimate for the requested

11  maintenance. Dkt. No. 32 at 1; Dkt. No. 33-2 at 2. The estimate noted, among other things, that

12  the "work would be done pursuant to [Platypus's] standard terms and conditions" and that a copy

13  of the terms and conditions would be provided upon request. Dkt. No. 32 at 1; *see* Dkt. No. 33-1

14  at 39. Kennedy avers that Forderer responded via voicemail agreeing that Platypus could do the

15  work, and that she texted him on December 20, 2021 asking for a deposit, which he then completed

16  over the phone. Dkt. No. 32 at 1; Dkt. No. 38 at 3. Kennedy then sent Forderer an email with the

17  terms and conditions on December 21, 2021, along with additional requests for documentation,

18  such as proof of insurance and a copy of the vessel registration. Dkt. No. 32 at 1; *see also* Dkt. No.

19  33-1 at 7–9 (Forderer deposition testimony confirming receipt of email); *id.* at 42, 46–49 (Dec. 21,

20  2021 email and attached terms and conditions).

---

[2] "Under a bareboat charter, the owner gives the charterer full possession and control of the vessel for a period of time. The charterer is responsible for directing the operations of the vessel and providing the master and crew. Admiralty law treats the bareboat charterer as the owner for many purposes." *Amoco Egypt Oil Co. v. Leonis Navigation Co.*, 1 F.3d 848, 849 n.1 (9th Cir. 1993); *see also Lieblong v. Abella*, 503 F. Supp. 3d 1011, 1016 n.2 (D. Haw. 2020).

[3] Paliador sold the vessel in July 2023 with a $100,000 discount for the paint damage described herein. Dkt. No. 40 at 1, 42. At the time this motion was submitted, the sale remained pending. Dkt. No. 38 at 15.

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT - 2

On January 15, 2022, Forderer emailed Platypus with information for the upcoming haul out, including: "1) a worklist, 2) docking plan with photographs, 3) power connection photographs, 4) EMF shielding photos, and 5) tank cleaning information." Dkt. No. 38 at 3, 19. Forderer also noted that Platypus had previously worked on the PALIADOR under a different name, but Platypus did not register this detail when preparing to haul the vessel out of the water in January 2022. *Id.* at 3, 19; *see* Dkt. No. 34 at 1 (Declaration of Platypus president Chris Feffer: "Although the fact had been mentioned to the COVID-suffering project manager, it was not mentioned to the crew that was hauling the vessel. Likewise, the size of the vessel was misidentified, so it did not show up in a cross reference.").[4]

**B.      Platypus Damages the Vessel's Paint While Hauling It Out of the Water**

When Forderer arrived aboard the vessel at Platypus's shipyard on January 18, 2022, Platypus's employees directed him to position the PALIADOR in its haul out slip where Platypus's "TravelLift [sic] equipment could be used to remove the yacht from the water and to place her up . . . on blocks[.]" Dkt. No. 38 at 4; *see also* Dkt. No. 31 at 4 n.2 ("'Travelift' is the trade name for a brand of mobile cranes which utilize slings supported by wire ropes to hoist boats."). As the Platypus employees lifted the PALIADOR from the water using the Travelift, the straps slipped, damaging the vessel's paint. Dkt. No. 38 at 5; *see also* Dkt. No. 33-1 at 10–11, 51, 85; Dkt. No. 33-2 at 13; Dkt. No. 34 at 1. The Platypus employees then lowered the vessel back into the water, properly reconnected the lifting straps, and hauled the PALIADOR out for maintenance. Dkt. No. 38 at 5.

Feffer texted Forderer after the incident to tell him that Platypus would conduct an inspection of the damage the following day. *Id.* at 5–6; *see also id.* at 30 (Jan. 18, 2022 text message

---

[4] The vessel's length is specified in different parts of the record as 90, 100, and 102 feet. *See, e.g.*, Dkt. No. 33-1 at 38 (100'); *id.* at 52 (90'); *id.* at 80 (27.30 meters, or 89.57'); Dkt. No. 38 at 2 (102').

from Feffer to Forderer). Forderer also avers that he and Feffer discussed the type of paint used on the vessel's "topsides area, i.e., the area between the bootstripe at the waterline and the gunwales at the deck edge." *Id.* at 6. The parties dispute what was discussed; Feffer states that "Forderer informed Platypus that the paint was Awlgrip Awlcraft 2000," Dkt. No. 34 at 2, while Forderer denies this, Dkt. No. 38 at 6 ("I never told Chris Feffer, nor anyone else, that the Vessel's hull topsides paint was Awlcraft or 'Awlgrip Awlcraft'"; "On January 19, 2022, I informed Chris Feffer via text message that the hull topsides paint was 'Awl Grip Mauritius Blue.'"). A coating inspection report later commissioned by Paliador found that the hull of the vessel was painted with "Awlgrip G-line Mauritius Blue H5615," while the superstructure and boot strike were painted with "Awlgrip Awlcraft 2000 Oyster White F8139." Dkt. No. 33-1 at 80.[5]

On January 19, 2022, after Platypus approached the paint manufacturer, AkzoNobel, for information on repairing the paint damage from the haul out incident, a representative emailed Feffer with guidance on how to remove scratches in Awlcraft 2000 paint. Dkt. No. 34 at 2; Dkt. No. 33-1 at 53–54; Dkt. No. 38 at 38–39.[6] On January 20, 2022, Feffer forwarded the manufacturer's information to Forderer and asked for Forderer's "go ahead" to proceed with "the recommended procedure from Awlgrip for the blue paint." Dkt. No. 33-1 at 52–53; Dkt. No. 38 at 38. Forderer, in turn, forwarded Roach "the hull polishing/ repair guidance received from Awlgrip," stating that he was "comfortable" with the recommendation and asking for Roach's

---

[5] Despite their own consultant, Coating Consultants for Superyachts, referring to the paint as "Awlgrip Awlcraft" in its June 2022 report, *id.*, representatives for Paliador contend that "no one refers to Awlcraft paint as 'Awlgrip Awlcraft,'" Dkt. No. 36 at 3; Dkt. No. 38 at 7 (Forderer: "Other than from Platypus, and only after this lawsuit was filed, I had never heard anyone say 'Awlgrip Awlcraft'"); *id.* at 10 ("no one ever refers to Awlcraft paint as 'Awlgrip Awlcraft'"); Dkt. No. 39 at 2 (Mason, the Technical Manager of Coating Consultants, contradicting the terminology in the Coating Consultants report by stating that "[t]here is no such thing as 'Awlgrip Awlcraft,' as anyone with any experience in the industry knows."); Dkt. No. 40 at 6 (Roach: "[D]espite being a yacht owner of various yachts over decades I have never heard Awlgrip topsides paint referred to as anything other than 'Awlgrip.'").

[6] Awlgrip and Awlcraft are two brands of paint manufactured by AkzoNobel, each with their "own very specific care and repair protocols[.]" Dkt. No. 33-1 at 21; *see also* Dkt. No. 38 at 7; Dkt. No. 39 at 2; Dkt. No. 31 at 6.

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT - 4

approval. Dkt. No. 33-1 at 52; Dkt. No. 38 at 42. In his email to Roach, Forderer wrote that he had "confirmed [the] hull paint as Awl Grip Flag Blue and [the] bottom paint as Trilux 33 with Tim Kemper at Marine Group S[an] D[iego]," the company that had last painted the vessel. Dkt. No. 33-1 at 52; Dkt. No. 38 at 42; *see also* Dkt. No. 38 at 8 (Forderer declaration: "[I] recommended to my employer that we authorize Platypus to proceed as proposed"); Dkt. No. 34 at 2 (Feffer declaration: "[Forderer] authorized the repairs and requested repairs of additional areas"). In his declaration, Forderer attests that he "did not deem it necessary to read deep into the email thread [Feffer] sent [him] or to do any other on-the-fly fact checking of his statement about what the manufacturer specified regarding the required repair protocol for the Awlgrip topsides paint[.]" Dkt. No. 38 at 8; *see also* Dkt. No. 33-1 at 27 (Forderer's deposition testimony stating that it was a "mistake" on his part to refer to the paint color as Flag Blue).

The day before, however, Forderer had texted Feffer that the hull topside paint was "Awl Grip Mauritius Blue." Dkt. No. 38 at 6, 32, 34.  Forderer also texted Feffer on January 20, 2022 with the instructions and specifications from the February 2021 paint job completed by Marine Group San Diego, which indicated that the hullsides were painted with "Awlgrip Flag Blue." Dkt. No. 38 at 36.[7]

## C.   Platypus Starts Work on the Vessel, Including on the Damaged Paint

On January 26, 2022, Forderer signed and returned the estimate and terms and conditions that Kennedy had previously sent him. Dkt. No. 33-1 at 55–62; *see also id.* at 18–20 (Forderer's deposition testimony confirming that he had Roach's authority to sign the documents and had read through them before signing). The handwritten work description in the terms states: "Clean tanks remove converter." *Id.* at 59.

---

[7] The Marine Group San Diego stated in February 2022 that the vessel's hullsides had been painted Awlgrip Mauritius Blue in February 2021. Dkt. No. 33-1 at 81.

1      At some point after Platypus began working on the vessel, Forderer observed a Platypus

2  employee "perform[ing] the incorrect polishing and sanding repair" to the areas damaged during

3  the initial haul out and directed him to stop. Dkt. No. 38 at 8 ("When I saw that, I asked him to

4  stop because I knew you should not see blue coloration on the pads. . . . I then instructed Platypus

5  not to perform any further repairs to the Vessel until the Awlgrip paint manufacturer could be

6  consulted about what Platypus Marine was doing."); *see also* Dkt. No. 33-1 at 85 (Paliador's

7  inspector's report: "Awlgrip G-Line CANNOT be polished or locally repaired i.e., sprayed with

8  fade-out zones which are later polished. . . . The abrasive effect of the polishing pad will expose

9  the pigments without the polyurethane binder resulting in accelerated weathering and ageing of

10  the coating system."); Dkt. No. 33-2 at 13 (Paliador's 30(b)(6) deposition testimony stating that

11  Platypus damaged the vessel's paint subsequent to the haul-out incident when it "machine-

12  polish[ed] the entirety of the hull"). From Feffer's perspective, "Platypus repaired the areas in

13  accordance with the specifications" provided by the manufacturer and authorized by Paliador. Dkt.

14  No. 34 at 2. On February 8, 2022, Forderer texted Mr. Lazaro, the Platypus worker polishing the

15  hull, "Let's not do anything further until we can all agree and I can share with the owner." Dkt.

16  No. 33-1 at 22, 63; Dkt. No. 38 at 46. Lazaro responded, "Thanks for your update, yeah nothing

17  'till my boss tells so." Dkt. No. 33-1 at 63.

18      A week later, on February 15, 2022, Forderer emailed Platypus that he "would like to close

19  down [thei]r work list." *Id.* at 64. He lamented that in the month since the vessel arrived at

20  Platypus's shipyard, the parties had not accomplished what he had hoped they would and that "the

21  damage caused during the haulout [had] yet to be resolved." *Id.* Forderer also requested a calendar

22  reflecting "the revised worklist including the completion of the hull damage repair[.]" *Id.* Platypus

23  responded the same day, attaching a tentative schedule to "wrap up the projects as described in the

24

revised work list." *Id.* at 64–65. The next day, Paliador directed Platypus to stop all work that had not yet been started. Dkt. No. 33-2 at 16–17.

**D.      Platypus Formally Acknowledges Damaging the Vessel's Paint and Offers to Remedy**

On March 17, 2022, Kennedy emailed a letter to Roach regarding the damage to the vessel and the process for repair, copying Forderer and Feffer on the message. Dkt. No. 33-1 at 66; *see also id.* at 30 (Forderer deposition testimony); Dkt. No. 38 at 10 (Forderer declaration). The letter was signed by Feffer and Jud Linnabary and addressed to "Mr. Roach & Captain Tim," and stated as follows:

> We apologize for scratching your vessel. We would like to remedy this by painting the blue portion of the hull.
>
> Before the boat was polished, we were told that the hull was AwlCraft paint, we presented an Awlcraft procedure the captain agreed upon. This Procedure was followed. After the polish was completed it was discovered that the hull is actually painted in AwlGrip and that we have compromised the paint by following the incorrect procedures for AwlGrip because Awlcraft procedure was used.
>
> We have arranged for a surveyor to inspect the paint and are waiting for schedule confirmation. We expect this to take place in the next week and will advise.
>
> The survey will identify the current paint and will also ensure that the hull is painted to the standard it was previously painted. Once complete we expect the hull paint to be in better condition than when the vessel arrived. [Platypus] will not be held responsible for the current condition of substrate, and only will be responsible for the paint that Platypus applies, and the surveyor will confirm this.
>
> We expect the paint to be completed one month after work commences. We do not know the color the boat is currently painted. We have been told Flag Blue and Mauritius Blue, which would you prefer?
>
> We appreciate your patience. We would like to complete this as soon as possible, as we are sure you do as well.

Dkt. No. 33-1 at 67; *see* Dkt. No. 38 at 10. Platypus also received technical specifications for painting the vessel, referred to as an "Interspec," from AkzoNobel dated March 17, 2022. Dkt. No. 33-1 at 31–32, 68–77; Dkt. No. 34 at 2.

Notwithstanding the above, Forderer claims in his declaration that Platypus "was all-but completely non-responsive to [his] inquiries about status and plan" during the period between the haul out incident and the March 17 letter, "even block[ing his] text messages." Dkt. No. 38 at 11 ("It was only after I demanded a meeting, and arranged for an AkzoNobel representative to be included, that Platypus's management finally relented, and generated the March 17 letter[.]"); *see also id.* at 9 ("Platypus refused to acknowledge that sanding and polishing the Awlgrip painted surfaces on the Vessel was improper as a repair of the surfaces they had damaged with their Travel Lift slings, despite the fact that they received written repair protocol procedures from the paint manufacturer[.]"); *id.* at 10 ("I confronted Platypus and demanded Platypus follow the actual repair procedure specified by the manufacturer (AkzoNobel) for its Awlgrip G-Line topsides paint coatings.").

But Forderer also acknowledges in his declaration that Platypus "agreed in writing to repaint the PALIADOR as required because of the Awlgrip topsides paint." *Id.* Forderer likewise affirmed at deposition that "[Platypus] offered to repaint the vessel, correct the wrong, and to follow the[] technical specifications" contained in AkzoNobel's Interspec, and to do so "free of charge[.]" Dkt. No. 33-1 at 32. However, Forderer contends that this plan never came to fruition because Platypus refused to consider any "paint acceptance standard or similar method to determine whether the painting would be acceptable," or to agree to a timeline for the paint repair work. Dkt. No. 38 at 11; *see also id.* at 13; Dkt. No. 40 at 3–4; Dkt. No. 39 at 2–3.

In March 2022, Platypus offered to launch the vessel so that it could be used in the meantime, but Paliador decided against that course of action. Dkt. No. 33-2 at 10. Paliador declined because it wanted the repair work done and did not plan to return the vessel to the Pacific Northwest in the near future, and from its perspective, returning the vessel to Platypus's shipyard

just to get the paint fixed would not be "smart or efficient." *Id.* at 10–12; *see also* Dkt. No. 34 at 2.

**E.      The Parties Reach an Impasse and the Vessel is Re-Launched in June 2022**

Although the record does not provide a clear picture of what took place following Platypus's March 17 letter, on April 27, 2022, Platypus's counsel emailed Paliador's counsel to follow up on an April 7, 2022 email regarding Platypus's offer "to sand and paint the vessel," which Paliador apparently rejected. Dkt. No. 33-2 at 28. The follow-up email stated that Platypus had "repaired the scratch pursuant to Akzo[N]obel specifications and [was] ready to launch the vessel so that it [could] be used by the owner," but that "[t]he owner ha[d] refused to accept custody of the vessel." *Id.* The email cautioned that "[a]ll ongoing layday charges w[ould] be for the account of the owner," and that as stated in a prior March 29, 2022 email, "all repair to the vessel is properly for the account of the PALIADOR's hull underwriters" under the terms of the contract. *Id.* Paliador does not dispute this email, but testified at deposition that it "fully expected Platypus to come back to [Paliador] with agreeable, mutually agreed-on paint acceptance standards and a timeline for completion and for [Platypus] to fulfill [its] warranty obligation." *Id.* at 19–20; *see also id.* at 14 ("Platypus has the ability to paint the boat if we had agreed-upon paint acceptance standards, which is the norm in the superyacht industry, and [if Platypus] agreed to a timeline, which [it] wouldn't do[.]").

The vessel eventually left Platypus's shipyard in June 2022 after the parties reached an impasse. *Id.* at 22, 26; *see also* Dkt. No. 34 at 2 (Feffer declaration: "Platypus again approached Awlcraft to request specifications to paint the top of the boat. The specifications were provided to [Paliador]. The parties, however, were never able to come to an agreement. Platypus, therefore,

1    never painted the boat.").[8] Paliador claims that Platypus caused $1,000 in damage to the vessel's

2    cap-rail when re-launching it in June 2022. Dkt. No. 38 at 15; Dkt. No. 33-2 at 19. Paliador did

3    not repair the damage Platypus caused to the vessel's paint prior to selling it. Dkt. No. 33-2 at 12–

4    13; *see also* Dkt. No. 40 at 1, 42 (showing that Paliador sold the vessel in July 2023 with a $100,000

5    discount for paint damage).

6            The parties dispute how much it would have cost to repair the damage Platypus caused.

7    Paliador asserts that it would have cost approximately $122,000, *see* Dkt. No. 33-2 at 19; Dkt. No.

8    38 at 14–15, while Platypus estimates $55,000, which is the amount it would charge for such work,

9    Dkt. No. 34 at 2. The parties also dispute the extent of the damage to the vessel that pre-dated the

10   haul out incident. Feffer attests in his declaration that when he inspected the vessel after Platypus

11   scratched it during the haul out, he "noticed a significant amount of preexisting issues with the

12   paint on the yacht," including "numerous swirls and other marks in other areas where the fenders

13   had rubbed against the paint." Dkt. No. 34 at 1; *see also* Dkt. No. 33-1 at 50–51 (Feb. 18, 2022

14   email capturing pictures of what Feffer described as "previous buff marks" on the PALIADOR).

15   Forderer, on the other hand, testified at deposition that there were some issues that were not the

16   result of the haul out, but they represented "a very small, single-digit percentage of the total paint

17   work, total damage." Dkt. No. 33-1 at 35–36; *see also* Dkt. No. 38 at 13–14, 16; Dkt. No. 33-1 at

18   83. He notes in his declaration that Paliador never demanded that Platypus address for free these

19   "minor imperfections," but instead "repeatedly" asked Platypus to provide a quote for repair,

20   which it did not do. Dkt. No. 38 at 14.

21

22

23   _____

24   [8] Paliador asserts that "Platypus refused to return the Vessel to the water until [Paliador] paid in full the yard fees,"
     despite having previously agreed in March 2022 that "it would not charge yard fees while it undertook the required
     re-painting of the PALIADOR." Dkt. No. 38 at 12, 14; *see also* Dkt. No. 40 at 3.

1

**F.     Paliador Files Suit**

2

In August 2022, Paliador initiated this action to recover monetary damages from Platypus

3

for negligence, breach of maritime contract, conversion, fraud and misrepresentation, and violation

4

of the Washington Consumer Protection Act ("CPA"), Wash. Rev. Code § 19.86 *et seq.* Dkt. No.

5

1 at 6–9. Platypus moved for summary judgment on all of Paliador's claims. Dkt. No. 31.

6

## II.     DISCUSSION

7

**A.     Jurisdiction**

8

The Court has admiralty jurisdiction over this case pursuant to 28 U.S.C. § 1333(1) because

9

Paliador alleges a breach of a maritime contract. *See* Dkt. No. 1 at 6; *Farwest Steel Corp. v. Barge*

10

*Sea Span 241*, 769 F.2d 620, 621 (9th Cir. 1985) (district court had admiralty jurisdiction when

11

adjudicating a contract relating to the repair of an already constructed vessel); *W. Towboat Co. v.*

12

*Vigor Marine, LLC*, 544 F. Supp. 3d 1100, 1116 (W.D. Wash. 2021) ("A contract that relates to a

13

ship, to commerce or navigation on navigable waters, or to maritime employment is a maritime

14

contract."). The Court has supplemental jurisdiction over Paliador's other claims pursuant to 28

15

U.S.C. § 1367(a). *See Sentry Select Ins. Co. v. Royal Ins. Co. of Am.*, 481 F.3d 1208, 1220 (9th

16

Cir. 2007).

17

**B.     Summary Judgment Standard**

18

Summary judgment is appropriate only when "the movant shows that there is no genuine

19

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

20

Civ. P. 56(a). The Court does not make credibility determinations or weigh the evidence at this

21

stage. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The sole inquiry is "whether the

22

evidence presents a sufficient disagreement to require submission to a [factfinder] or whether it is

23

so one-sided that one party must prevail as a matter of law." *Id.* at 251–52. And to the extent that

24

the Court resolves factual issues in favor of the nonmoving party, this is true "only in the sense

that, where the facts specifically averred by that party contradict facts specifically averred by the movant, the motion must be denied." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990).

The Court will, however, enter summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Once the moving party has carried its burden under Rule 56, "the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (cleaned up). Metaphysical doubt is insufficient, *id.* at 586, as are conclusory, non-specific allegations, *Lujan*, 497 U.S. at 888–89. It is not the Court's job to "scour the record in search of a genuine issue of triable fact"; rather, the nonmoving party must "identify with reasonable particularity the evidence that precludes summary judgment." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996) (quoting *Richards v. Combined Ins. Co.*, 55 F.3d 247, 251 (7th Cir. 1995)).

**C.    Platypus's Motion for Summary Judgment is Granted in Part and Denied in Part**

Platypus moves for summary judgment on each of Paliador's five causes of action and asks that the Court dismiss them with prejudice, or alternatively, limit Paliador's damages to the amount permitted by the parties' contract, which it claims is $55,000. *See* Dkt. No. 31 at 2, 10, 16. Paliador opposes the motion. *See generally* Dkt. No. 36.

For the reasons discussed below, the Court grants Platypus's motion as to Paliador's negligence, conversion, fraud and misrepresentation, and CPA claims, but finds that issues of fact preclude full summary judgment on Paliador's breach of contract claim.

1.    Applicable Law

"By granting federal courts jurisdiction over maritime and admiralty cases, the Constitution implicitly directs federal courts sitting in admiralty to proceed 'in the manner of a common law

court.'" *The Dutra Grp. v. Batterton*, 139 S. Ct. 2275, 2278 (2019) (quoting *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 489–90 (2008)); *see also E. River S.S. Corp. v. Transamerica Delaval Inc.*, 476 U.S. 858, 864 (1986) ("With admiralty jurisdiction comes the application of substantive admiralty law."). This means that "[w]hen a contract is a maritime one, and the dispute is not inherently local, federal law controls the contract interpretation." *Norfolk S. Ry. Co. v. Kirby*, 543 U.S. 14, 22–23 (2004); *accord Clevo Co. v. Hecny Transp., Inc.*, 715 F.3d 1189, 1194 (9th Cir. 2013). "The exercise of admiralty jurisdiction, however, 'does not result in automatic displacement of state law.'" *Yamaha Motor Corp., U.S.A. v. Calhoun*, 516 U.S. 199, 206 (1996) (quoting *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 545 (1995)). State law may supplement federal maritime law when such federal common law is silent on an issue or when a dispute is inherently local. *NextWave Marine Sys., Inc. v. M/V Nelida*, 488 F. Supp. 3d 1004, 1010 (D. Or. 2020). State law may not be applied if it would conflict with maritime law. *See Aqua-Marine Constructors, Inc. v. Banks*, 110 F.3d 663, 667–68 (9th Cir. 1997); *Ocean Beauty Seafoods LLC v. CAPTAIN ALASKA*, 603 F. Supp. 3d 1005, 1011 (W.D. Wash. 2022).

### 2. Platypus's Estimate and Terms and Conditions Limit the Remedies Available to Paliador

Platypus argues that its estimate and terms and conditions bound Paliador to an exclusive and limited remedy: repair, replacement, or cure by Platypus, with a liability cap of $100,000 and preclusion of consequential damages, including loss of use. Dkt. No. 31 at 15–16; *see* Dkt. No. 33-1 at 47–48. Paliador responds that the terms and conditions are unenforceable due to lack of consideration, and even if they were enforceable, the terms do not apply to the present dispute. Dkt. No. 36 at 7–13; *see* Dkt. No. 33-1 at 55–62.

"Maritime contracts 'must be construed like any other contracts: by their terms and consistent with the intent of the parties.'" *CITGO Asphalt Ref. Co. v. Frescati Shipping Co.*, 589

1   U.S. 348, 355 (2020) (quoting *Norfolk S. Ry. Co.*, 543 U.S. at 31).[9] Thus, basic common law

2   contract principles, including the elements of offer, acceptance, and consideration, apply in the

3   maritime context. *See Clevo*, 715 F.3d at 1194; *DeForge Mar. Towing, LLC v. Alaska Logistics,*

4   *LLC*, 591 F. Supp. 3d 939, 948 (W.D. Wash. 2022). The Ninth Circuit has referred to the Second

5   Restatement of Contracts when evaluating questions of contract formation within this framework.

6   *See e.g.*, *Clevo*, 715 F.3d at 1194.

7         Here, the undisputed facts are as follows:

8   • On December 13, 2021, Kennedy emailed Forderer a cost estimate in response to

9       Forderer's inquiry about maintenance. Dkt. No. 32 at 1; Dkt. No. 33-2 at 2. The

10       estimate noted, among other things, that "[t]his estimate is for work being done

11       pursuant to Platypus['s] standard terms and conditions which shall become the contract

12       between the parties. A copy of the terms and conditions will be provided on request."

13       Dkt. No. 33-1 at 39. It also stated that Platypus "warrants its own workmanship for a

14       one-year time period," and the vessel owner's "sole remedy for breach of the limited

15       warranty is for Platypus Marine to repair or redo the work." *Id.* at 40.

16   • Forderer then left a voicemail stating that Platypus could perform the requested work,

17       and Kennedy texted Forderer on December 20, 2021 asking for a deposit, which he

18       paid over the phone. Dkt. No. 32 at 1; Dkt. No. 38 at 3. Forderer did not request the

19       terms and conditions prior to agreeing to Platypus's offer.

20   • On December 21, 2021, Kennedy sent Forderer an email thanking him for "choosing

21       Platypus Marine for [the] project," attaching the terms and conditions, and asking for

22

23

24   ---
[9] Oral contracts are normally held to be valid under the principles of maritime law. *Kossick v. United Fruit Co.*, 365 U.S. 731, 734 (1961).

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT - 14

certain documentation in return. Dkt. No. 33-1 at 42; *see also* Dkt. No. 32 at 1; Dkt. No. 33-1 at 7–9, 46–49.

- On January 15, 2022, Forderer emailed Platypus to provide logistical information related to the vessel and to confirm his estimated time of arrival. Dkt. No. 38 at 19.

- On January 18, 2022, he arrived at the shipyard, where Platypus damaged the vessel. *Id.* at 4–5; Dkt. No. 33-1 at 10–11, 50–51; Dkt. No. 34 at 1.

- On January 20, 2022, Feffer forwarded AkzoNobel's guidance on how to remove scratches in "Awlcraft 2000 paint" to Forderer and asked for Forderer's "go ahead" to proceed with that procedure. Dkt. No. 33-1 at 52–53; Dkt. No. 38 at 38.

- On behalf of Paliador, Forderer authorized Platypus to proceed as proposed. Dkt. No. 38 at 8.

- On January 26, 2022, Forderer signed and returned both the estimate and terms and conditions. Dkt. No. 33-1 at 55–62.

- On February 8, 2022, Forderer observed Platypus performing incorrect polishing and sanding repair and instructed it to stop work. Dkt. No. 38 at 8–9, 46.

Paliador and Platypus do not dispute that the parties formed a binding agreement for vessel maintenance. Dkt. No. 36 at 8, 12; Dkt. No. 41 at 2; *see* Dkt. No. 32 at 1. However, Paliador argues that such agreement "did not include terms and conditions that had not been provided" prior to December 21, 2021. Dkt. No. 36 at 8. In the alternative, it asserts (without citation to the record) that "the sworn declarations and documents related to the referenced contract formation questions present genuine issues of material fact that preclude any summary determination." *Id.* at 13. For its part, Platypus contends that the terms and conditions were explicitly incorporated into the estimate language sent to Forderer on December 13, 2021. Dkt. No. 41 at 2.

Terms incorporated by reference will be found valid so long as it is clear that the parties to the agreement had knowledge of and assented to the incorporated terms. *See One Beacon Ins. Co. v. Crowley Marine Servs., Inc.*, 648 F.3d 258, 267–68 (5th Cir. 2011). The estimate Platypus sent to Paliador (1) included the costs of the haul out and other requested work, (2) stated that it was "for work being done pursuant to Platypus['s] standard terms and conditions which *shall become the contract between the parties*," and (3) noted that a copy of the terms would be provided upon request. Dkt. No. 33-1 at 38–39 (emphasis added). This language unambiguously signified that the terms were incorporated into the parties' agreement. *See Am. Marine Tech., Inc. v. M/Y Alchemist*, 526 F. Supp. 3d 1236, 1249 (S.D. Fla. 2021) (concluding that intent to incorporate service contract into the agreement was "clear from its inclusion in communications during negotiations" for the requested service), *aff'd sub nom. Am. Marine Tech, Inc. v. World Grp. Yachting, Inc.*, No. 21-11336, 2021 WL 4785888 (11th Cir. Oct. 14, 2021); *cf. M/V Am. Queen v. San Diego Marine Constr. Corp.*, 708 F.2d 1483, 1489 (9th Cir. 1983) (reasoning that "courts have recognized that it is a practice in the ship repair industry to do repair work before sending an invoice containing the contract for repairs," and finding that contract terms signed after vessel repair began were valid when they incorporated by reference all work done prior to the actual signing). Paliador assented to those terms by accepting Platypus's offer, paying the deposit, and delivering the vessel to Platypus. Dkt. No. 33-1 at 56, 58. And if there were any doubt or deficiency regarding the parties' agreement at that point in time, Paliador rectified it by signing the estimate and terms and conditions on January 26, 2022. Restatement (Second) of Conts. § 380, cmt. a (1981) ("A party who has the power of avoidance may lose it by action that manifests a willingness to go on with the contract. Such action is known as 'affirmance' and has the effect of ratifying the contract."); *see also M/V Am. Queen*, 708 F.2d at 1489; *M/Y Alchemist*, 526 F. Supp. 3d at 1249; *cf.* Restatement (Second) of Conts. § 132 ("The memorandum may consist of several writings if one

1   of the writings is signed and the writings in the circumstances clearly indicate that they relate to

2   the same transaction.").

3       Paliador's argument that these signed documents are restricted to the "covered" work of

4   tank cleaning and converter removal is without merit. Section 1 of the terms and conditions states

5   that "Platypus' undertaking . . . shall include necessary removals and replacements for access as

6   well as any changes to the work as requested by [Paliador] and agreed by Platypus pursuant to

7   Section 4." Dkt. No. 33-1 at 59. Therefore, the work included removal of the vessel from the water,

8   and Platypus's repair of the damage incurred on removal was consistent with Section 12 of the

9   terms and conditions. *Id.* at 60–61 ("Platypus shall repair/replace/cure the [non-conformity, defect,

10  or deficiency] at its expense").[10]

11      That Paliador allegedly "understood [the terms and conditions] as only 'paperwork'

12  [Platypus] indicated it wanted for its files," Dkt. No. 36 at 2; *see also* Dkt. No. 38 at 6, and "did

13  not deem it necessary to read deep into the email thread" asking for its approval of the scratch

14  removal procedure does not diminish the force or legal significance of the terms. *See Crowley*

15  *Marine Servs.*, 648 F.3d at 270 ("[T]he fact that a party chooses not to review a contract, or terms

16  and conditions, when they had the opportunity does not negate the fact that they are bound by

17  those Terms and Conditions." (quoting *One Beacon Ins. Co. v. Crowley Marine Servs., Inc.*, No.

18  H-08-2059, 2010 WL 1463451, at *5 (S.D. Tex. Apr. 12, 2010))). Nor does Forderer's subjective

19  understanding of the terms of the agreement. Although he states that he "did not regard the after-

20  the-fact paperwork that Platypus Marine sent as operative or controlling in connection with the

21

22  ───────────────
   [10] The repair could alternatively be characterized as "additional work" under Section 4, which notes that changes to
23  the scope of work "may be oral," but "[Paliador] shall . . . agree by e-mail if requested by Platypus." *Id.* at 60. That
   section goes on to state that such additional work "shall be subject to the terms and conditions of this agreement." *Id.*
   Consistent with these terms, Feffer expressly asked for Forderer's "go ahead" to proceed with the procedure received
   from AkzoNobel regarding removal of scratches in "Awlcraft 2000 paint," Dkt. No. 33-1 at 52–53; Dkt. No. 38 at 38,
24  and Forderer authorized the procedure, Dkt. No. 38 at 8.

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT - 17

damage already done and the repair Platypus Marine agreed to perform," and opines that the contract he signed "pertained by its stated terms only to the cleaning of the Vessel's fuel tanks and the replacement of an electronic component," the unambiguous terms state otherwise. Paliador's unexpressed understanding of the contract does not inject ambiguity into the terms or establish a dispute of material fact. Restatement (Second) of Contracts § 212, cmt. a (1981) ("[T]he relevant intention of a party is that manifested by him rather than any different undisclosed intention."); *Sea-Land Serv., Inc. v. Sellan*, 64 F. Supp. 2d 1255, 1262 (S.D. Fla. 1999) (under admiralty law, "[a] party's secret hopes and wishes count for nothing because the status of a document as a contract depends on what the parties express to each other and to the world, not on what they keep to themselves") (cleaned up); *Lynott v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 871 P.2d 146, 149 (Wash. 1994) ("Unilateral or subjective purposes and intentions about the meanings of what is written do not constitute evidence of the parties' intentions.").

The estimate and terms and conditions limit Paliador's remedies. As noted above, the estimate states that Platypus "warrants its own workmanship for a one-year time period," and the vessel owner's "sole remedy for breach of the limited warranty is for Platypus Marine to repair or redo the work." Dkt. No. 33-1 at 40. Section 12.A of the terms and conditions repeats the limited warranty, reiterates that repair or replacement is the owner's "sole remedy," and specifies a liability cap of $100,000:

> Platypus warrants that its work shall precisely conform to that identified as the responsibility of Platypus in the Description and any amendment, that the same shall be free from defects and deficiencies, and that its workmanship shall otherwise be of good commercial quality for a period of one (1) year after the date and time of redelivery of the Vessel to [Paliador] (referred to as the warranty period), subject to the following:
>
> (1). All non-conformities, defects, and deficiencies must be discovered and notified in writing to Platypus within the warranty period identified above.
>
> (2). Platypus shall have reasonable opportunity to inspect the Vessel and claimed

non-conformity, defect, and/or deficiency in its condition as first discovered and before any repair has commenced, except in emergency circumstances.

(3). Platypus shall have reasonable opportunity to repair/replace/cure the same. In such an event, [Paliador] shall deliver the Vessel and/or defective work or materials, etc. to Platypus at [Paliador]'s expense, and Platypus shall repair/replace/cure the same at its expense, time being of the essence. . . .

(6) All other warranties whether express or implied are specifically disclaimed.

(7) Platypus' maximum liability pursuant to the warranty set forth herein shall not exceed, in the aggregate, the lesser sum of $100,000 or the value of the work performed by Platypus under this Agreement.

(8) [Paliador]'s sole remedy for damage to the vessel, whether sounding in contract or tort, shall be limited to this warranty.

(9) Platypus' maximum liability to [Paliador] for all causes of action, sounding in contract or tort, is $100,000, even if the damage was caused by the sole negligence or fault of Platypus.

Dkt. No. 33-1 at 60–61. Section 12.C of the terms and conditions again reiterates the "exclusivity of remedy":

The foregoing shall be [Paliador]'s sole and exclusive remedy against Platypus; in no event shall Platypus be liable to [Paliador] for work performed on any other basis or under any other theory, including, but notlimited to, actions based on negligence or strict liability, and [Paliador] hereby waives any and all other warranties, express and implied, respecting the work, including without limitation all warranties of merchantability, fitness/suitability for any particular purpose/use and workmanlike service.

*Id.* at 61. And finally, Section 15 excludes consequential damages, including loss of use:

[N]either party shall be responsible for any special or consequential damages whatsoever, including without limitation any claim for extra expense, loss of earnings,loss of profits, loss of use and business interruption, delay damages, whether resulting from negligence, breach of this agreement or otherwise, even if the possibility of such damages may have been foreseeable.

*Id.* at 62. Paliador does not argue that any of these provisions are unenforceable in the event the Court finds—as it has here—that the terms and conditions are enforceable and govern the work done to repair the paint on the vessel. *See generally* Dkt. No. 36; *see also Arcwel Marine, Inc. v.*

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT - 19

1    *Sw. Marine, Inc.*, 816 F.2d 468, 471 (9th Cir. 1987) ("Clear precedent holds that, 'absent evidence

2    of overreaching, clauses limiting liability in ship repair contracts will be enforced.'" (quoting *M/V*

3    *Am. Queen*, 708 F.2d at 1488)); *M/V Am. Queen*, 708 F.2d at 1488 ("It is well settled that in

4    admiralty law, the parties to a repair contract may validly stipulate that the shipowner is to assume

5    all liability for *all* damage occasioned by the negligence of the shipyard."); *United States Fire Ins.*

6    *Co. v. Foss Mar. Co.*, No. 2:21-CV-01506-RAJ, 2023 WL 2538787, at *5 (W.D. Wash. Mar. 16,

7    2023) ("Because the exclusive remedy for breach of contract (whether or not it stems from a claim

8    of defective workmanship) is repair or replacement, and Plaintiffs seek damages (and do not and

9    have not sought repair), their breach of contract claim is barred as a matter of law."); *Dann Marine*

10   *Towing, LC v. Gen. Ship Repair Corp.*, No. CV MJG-12-1610, 2017 WL 3916992, at *25 (D. Md.

11   Sept. 7, 2017) (holding that loss-of-use damages were not recoverable where the contract at issue

12   had a consequential damages limitation). Furthermore, the Court finds no evidence of

13   overreaching.

14        The Court therefore grants summary judgment to Platypus on its claims that Paliador's

15   remedies are limited to repair, replacement, or cure, and in any event may not exceed the lesser of

16   $100,000 or the value of the work performed by Platypus. Dkt. No. 31 at 16. However, Paliador

17   has established a dispute of material fact as to whether Platypus breached its obligation to repair,

18   replace, or cure, as discussed below.

19        3.   Paliador's Causes of Action

20        The Court next analyzes each of Paliador's five causes of action, and for the reasons set

21   forth below, denies summary judgment as to Paliador's breach of contract claim and grants

22   summary judgment as to its remaining claims.

23        *(a) Breach of Contract*

24        "To establish breach of a maritime contract, a plaintiff must demonstrate '(1) the existence

of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages.'" *Vigor Marine*, 544 F. Supp. 3d at 1116 (quoting *Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y.*, 375 F.3d 168, 177 (2d Cir. 2004)). Here, the parties vehemently dispute whether they each lived up to their end of the bargain.

Again, under the terms and conditions, Platypus warranted that its work "shall precisely conform to that identified as the responsibility of Platypus in the Description and any amendment, that the same shall be free from defects and deficiencies, and that its workmanship shall otherwise be of good commercial quality"; provided, however, that "Platypus shall have reasonable opportunity to repair/replace/cure the same. . . . at its expense, time being of the essence." Dkt. No. 33-1 at 60–61. Paliador argues that, in undertaking the paint repair, Platypus should have known that there was no such thing as "Awlgrip Awlcraft" paint, and in any event failed to expeditiously remedy the problem at its expense. Dkt. No. 36 at 2–5; Dkt. No. 38 at 13 (Forderer: "Platypus delayed the repair, refused to agree to any recognized paint acceptance standard, [and] refused to agree to any timeline, time limit or deadline for effecting the repair"); Dkt. No. 39 at 2–3 (Mason: "There is no such thing as 'Awlgrip Awlcraft,' as anyone with any experience in the industry knows," and it is unreasonable, "and not in keeping with standard practice in the industry, to refuse to agree and commit to a paint acceptance standard, and/or to refuse to commit to a timeline or deadline for completion of the project."). And Paliador has submitted evidence that it provided some indicators that Awlcraft was the incorrect type of paint prior to commencement of the work: on January 19, 2022, Forderer texted Feffer that "Awl Grip Mauritius Blue" was the hull color, Dkt. No. 38 at 6, 32, 34, and the next day, Forderer forwarded the painting procedure used by Marine Group Boat Works, which indicated that the paint color was "Awlgrip Flag Blue," *id.* at 6, 36. A reasonable factfinder could conclude that, given the conflicting messaging from

Paliador, Platypus should have triple-checked the color and procedure prior to commencing work, despite Paliador's approval of the proposed procedure.

On the other hand, a reasonable factfinder could conclude that Platypus was blameless: Paliador sent multiple conflicting messages to Platypus regarding paint type and paint color, and when Platypus dutifully obtained the recommended procedure from the manufacturer for one of those types of paint, Paliador approved it. Dkt. No. 41 at 4–5; Dkt. No. 38 at 8. Then, Paliador unreasonably rejected Platypus's generous offer to correct the problem Paliador caused—using technical specifications that, by Forderer's admission, were appropriate—thereby failing to allow Platypus a "reasonable opportunity to repair/replace/cure" the issue as required by Section 12.A(3) of the terms and conditions. *See* Dkt. No. 34 at 2; Dkt. No. 33-1 at 32 ("[Platypus] offered to repaint the vessel, correct the wrong, and to follow these technical specifications in applying the paint.").

The Court cannot weigh the evidence at this stage, and this genuine dispute of material fact precludes summary judgment on Paliador's breach of contract claim.

> *(b) Negligence*

Paliador alleges that Platypus had "a duty to exercise reasonable care under the circumstances while positioning and securing the slings of its Travel Lift and hauling out the S/Y PALIADOR," and "breached that duty of care by failing to connect the fore and aft Travel Lift lifting slings to each other prior to attempting to lift the vessel." Dkt. No. 1 at 6. As discussed above, Paliador's negligence claim is foreclosed by the parties' contract. *Royal Ins. Co. of Am. v. Sw. Marine*, 194 F.3d 1009, 1014 (9th Cir. 1999) ("exculpatory clauses are enforceable even when they completely absolve parties from liability for negligence"). The Court accordingly grants summary judgment to Platypus on this claim.

*(c) Conversion*

Assuming without deciding that the terms and conditions do not bar Paliador's conversion claim, the Court agrees with Platypus that this claim fails as a matter of law. Dkt. No. 31 at 19–20; Dkt. No. 41 at 11–12.

"Under Washington law, conversion 'occurs when a person intentionally interferes with chattel belonging to another, either by taking or unlawfully retaining it, thereby depriving the rightful owner of possession.'" *Ocean Beauty Seafoods*, 603 F. Supp. 3d at 1012 (quoting *Alhadeff v. Meridian on Bainbridge Island, LLC*, 220 P.3d 1214, 1223 (Wash. 2009)).[11] Paliador bears the burden of proof on this claim at trial, but has not presented sufficient evidence to reasonably support a verdict in its favor. *See NextWave Marine Sys.*, 488 F. Supp. 3d at 1016. Paliador argues that Platypus refused to return the vessel "when that request was first made," and instead held "the vessel as ransom for its unilaterally imposed 'yard fees[.]'" Dkt. No. 36 at 26; *see also* Dkt. No. 38 at 16; Dkt. No. 40 at 3. However, the evidence does not support this assertion. Forderer avers in his declaration that Paliador did not "demand the immediate return of the yacht," Dkt. No. 38 at 12, and the record shows that Platypus offered in March 2022 to launch the vessel but Paliador declined, Dkt. No. 33-2 at 10–12, 28; *see also* Dkt. No. 34 at 2. That Platypus subsequently warned Paliador that "ongoing layday charges w[ould] be for the account of the owner," Dkt. No. 33-2 at 28, and Paliador thereafter paid such fees may be relevant to Paliador's breach of contract claim, but it does not present a genuine issue for trial with respect to its conversion claim. Thus, the Court grants Platypus's motion as to this claim.

*(d) Fraud and Misrepresentation*

Paliador's fraud and misrepresentation claim suffers the same fate. A fraud claim in this

---

[11] Substantive admiralty law and Washington state law do not appear to conflict with respect to Paliador's conversion and fraud and misrepresentation claims, and the Court therefore cites to Washington law. *See id.* at 1011; *see also Su v. M/V S. Aster*, 978 F.2d 462, 472 (9th Cir. 1992).

context must prove each of the following nine elements:

> (1) representation of an existing fact; (2) materiality; (3) falsity; (4) the speaker's knowledge of its falsity; (5) intent of the speaker that it should be acted upon by the plaintiff; (6) plaintiff's ignorance of its falsity; (7) plaintiff's reliance on the truth of the representation; (8) plaintiff's right to rely upon it; and (9) damages suffered by the plaintiff.

*Stieneke v. Russi*, 190 P.3d 60, 69 (Wash. Ct. App. 2008); *accord M/V S. Aster*, 978 F.2d at 472–73. "Each element is essential; if any is missing, the entire claim fails." *M/V S. Aster*, 978 F.2d at 473. Paliador argues that the declarations it submitted in opposition to Platypus's motion demonstrate that

> Platypus represented it had the capacity to perform the requested work competently and without delay when it knew it did not; represented it had the expertise to haulout superyachts like the PALIADOR, when it knew it did not; represented it had expertise in repairing Awlgrip paint coatings, when it knew it did not; represented that the proper repair protocol for Awlgrip topsides paint involved machine polishing and sanding, when it knew otherwise; represented it was not charging yard fees while the vessel remained on the hard at Platypus Marine's Port Angel[e]s facility, when it secretly intended to bill for such "services" all along; fraudulently billed for time during which its workers were not actually working on the vessel and required payment in full on the resulting fraudulent invoices; etc.

Dkt. No. 36 at 24–25 (footnote omitted). Paliador adds that it "relied on those knowingly fraudulent material statements, as intended and as it had a right to do," and argues that "[a]t the very least, these sworn statements show that genuine issues of material fact preclude dismissal of the fraud and misrepresentation claims under Rule 56." *Id.* at 25 (citations to declarations omitted). But Paliador's declarations fail to establish genuine issues of fact with respect to, at minimum, the fourth element listed above.

A court may "disregard a self-serving declaration that states only conclusions and not facts that would be admissible evidence." *Nigro v. Sears, Roebuck & Co.*, 784 F.3d 495, 497 (9th Cir. 2015); *accord S.E.C. v. Phan*, 500 F.3d 895, 909 (9th Cir. 2007); *Keodara v. Boe*, No. 3:21-CV-5129-TMC-TLF, 2023 WL 6377570, at *5 (W.D. Wash. Sept. 29, 2023). In this case, the Court

finds that Forderer's and Roach's declarations assert legal conclusions in support of Paliador's fraud claim rather than facts that would be admissible evidence. For instance, both Forderer and Roach repeatedly aver that Platypus misrepresented its capacity to timely complete the requested work, *see* Dkt. No. 38 at 3, 12, Dkt. No. 40 at 2–4, but fail to show how Platypus's purported representations were knowingly false. Similarly, Forderer avows that Platypus unequivocally knew when the parties both agreed to the polishing procedure that such procedure was incorrect. *See, e.g.*, Dkt. No. 38 at 7 ("I know from the March 2022 *mea culpa* letter Platypus issued, that Platypus Marine knew at the time there is no such thing as 'Awlgrip Awlcraft' and that they also knew the correct repair procedure specified by AkzoNobel requires re-painting of the damaged surfaces."); *id.* at 8 ("While sanding and polishing can be used to repair Awl**craft** painted surfaces, those techniques cannot be used on Awl**grip** . . . , as I later learned from the manufacturer, but as Platypus Marine knew at the time."); *id.* at 9 ("It is now obvious to me that Platypus attempted to pass off its 'quick-fix' improper sanding and polishing 'repair' as the proper repair protocol . . . knowing that the consequences would not be apparent to the untrained eye for several months[.]"); *id.* at 10 ("Mr. Feffer and Mr. Linnabary are well aware that no one refers to AkzoNobel's Awlgrip paint coatings as anything other than Awlgrip[.]"). Such conclusory and speculative assertions, absent additional evidence, do not create a genuine issue of material fact. *See Nigro*, 784 F.3d at 497. Indeed, it is undisputed that Platypus literally forwarded AkzoNobel's "recommendation . . . to remove scratches in Awlcraft 2000" to Paliador, Dkt. No. 33-1 at 52–53, which was the true and correct procedure for Awlcraft 2000. Although "[a] representation literally true is actionable if used to create an impression substantially false," *Ikeda v. Curtis*, 261 P.2d 684, 691 (Wash. 1953), here there is no evidence that Platypus intended to create a substantially false impression. Platypus sought Paliador's informed consent, commenced with the procedure Paliador approved, and when that was discovered to be incorrect, it "offered to repaint the vessel, correct

the wrong, and to follow the[ correct] technical specifications in applying the paint." Dkt. No. 33-1 at 32.

As for Paliador's arguments regarding yard fees and fraudulently billed time, these allegations are absent from its complaint. Dkt. No. 1 at 7. A litigant "may not effectively amend [his] Complaint by raising a new theory . . . in [his] response to a motion for summary judgment." *La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*, 624 F.3d 1083, 1089 (9th Cir. 2010); *see also Wasco Prods., Inc. v. Southwall Techs., Inc.*, 435 F.3d 989, 992 (9th Cir. 2006) ("Simply put, summary judgment is not a procedural second chance to flesh out inadequate pleadings." (quoting *Fleming v. Lind-Waldock & Co.*, 922 F.2d 20, 24 (1st Cir. 1990))).

The Court therefore grants Platypus's motion for summary judgment as to Paliador's fraud and misrepresentation claim.

### *(e) CPA*

The parties spend a significant portion of their briefing arguing whether federal maritime law preempts Paliador's CPA claim. *See* Dkt. No. 31 at 20–23; Dkt. No. 36 at 13–22; Dkt. No. 41 at 12–13. The Court need not address this issue, because even assuming that federal law does not preempt such a claim, Paliador fails to raise a genuine dispute of material fact sufficient to survive summary judgment.

First, Paliador's opposition brief does not address Platypus's arguments as to the merits of its CPA claim. *See generally* Dkt. No. 36. As previously noted, it is not the Court's responsibility to "scour the record in search of a genuine issue of triable fact," and the nonmoving party must instead "identify with reasonable particularity the evidence that precludes summary judgment." *Keenan*, 91 F.3d at 1279 (quoting *Richards*, 55 F.3d at 251). Nevertheless, based on the Court's review of the record, Paliador's claim fails as a matter of law.

To establish a CPA claim, Paliador must show (1) an unfair or deceptive act or practice,

1    (2) in trade or commerce, (3) impacting the public interest, (4) an injury to her property, and

2    (5) legal causation. *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 719 P.2d 531,

3    533 (Wash. 1986). Here, resolving all inferences in favor of Paliador, and even assuming without

4    deciding that Paliador can demonstrate a deceptive act on the part of Platypus, the Court finds that

5    Paliador fails to raise a genuine dispute as to whether Platypus's conduct affected the public

6    interest.

7          When a transaction can be characterized as "'a private dispute' rather than a consumer

8    transaction, it may be difficult to show a public interest in the subject matter." *Shugart v. GYPSY*

9    *Off. No. 251715*, No. 2:14-CV-1923-RSM, 2015 WL 1965375, at *3 (W.D. Wash. May 1, 2015)

10   (quoting *Goodyear Tire & Rubber Co. v. Whiteman Tire, Inc.*, 935 P.2d 628, 635 (Wash. Ct. App.

11   1997)). And where, as here, a private dispute exists over the provision of professional services,

12   courts evaluate four non-dispositive factors to make this determination: (1) whether the alleged

13   acts were committed in the course of defendant's business; (2) whether the defendant advertised

14   to the public in general; (3) whether the defendant actively solicited this particular plaintiff,

15   indicating potential solicitation of others; and (4) whether the plaintiff and defendant have unequal

16   bargaining positions. *See id.*; *accord Hangman Ridge*, 719 P.2d at 538 (explaining that these

17   factors "represent indicia of an effect on public interest from which a trier of fact could reasonably

18   find public interest impact").

19         It is undisputed that Platypus committed the alleged deceptive acts in the course of its

20   business. However, Forderer and Roach only make passing references to Platypus's advertising

21   and do not specify whether Platypus advertises to the public at large in the capacity in which

22   Paliador claims Platypus is being deceptive. Dkt. No. 38 at 3; Dkt. No. 40 at 2; *see, e.g.*, *Superwood*

23   *Co. v. Slam Brands, Inc.*, No. C12-1109-JLR, 2013 WL 4401830, at *10 (W.D. Wash. Aug. 15,

24   2013). Further, there is no record evidence that Platypus actively solicited Paliador or is likely to

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT - 27

solicit others. Instead, the record shows that Paliador reached out to Platypus when it could have presumably chosen any shipyard for maintenance. Dkt. No. 33-2 at 2; Dkt. No. 40 at 2. Likewise, Paliador does not cite to any evidence suggesting that the parties occupied unequal bargaining positions. Without more, the Court finds that "there is no real or substantial likelihood that large numbers of consumers would be injured in the same manner alleged by [Paliador] due to [Platypus's] particular . . . conduct in this case." *Peoples Bank v. Bluewater Cruising LLC*, No. C12-00939-RSL, 2014 WL 202105, at *10 (W.D. Wash. Jan. 17, 2014); *see also Oberto v. Platypus Marine, Inc.*, No. 3:16-CV-05320-BHS, 2018 WL 1022704, at *8 (W.D. Wash. Feb. 22, 2018) (concluding that plaintiffs had "not established that there is a likelihood that additional plaintiffs have been or will be injured in exactly the same fashion sufficient to change this matter from a private dispute to one that affects the public interest." (cleaned up)); *Michael v. Mosquera-Lacy*, 200 P.3d 695, 700 (Wash. 2009) (same); *Veeder v. NC Mach. Co.*, 720 F. Supp. 847, 853 (W.D. Wash. 1989) (same).[12]

Thus, Paliador has failed to raise a genuine issue of fact regarding a pattern of unfair practices that could transform what is in essence a breach of contract claim into a CPA claim. *See, e.g.*, *Storms v. Flagstar Bank, FSB*, No. 2:22-CV-00650-RAJ, 2023 WL 3723557, at *8 (W.D.

---

[12] To bolster its claim, Paliador submits a declaration from Drew F. Duggan asserting that he was also mistreated by Platypus in 2021 and 2022 when it damaged his vessel and refused to launch the vessel "until and unless the owner . . . paid Platypus in full for the disputed charges and defective work." Dkt. No. 37 at 1–2. This submission does not specify how his vessel was damaged, what about Platypus's work was defective, and the circumstances surrounding his dispute regarding the vessel's re-launch. Such highly generalized assertions cannot generate a dispute of fact as to whether Paliador's private disagreement impacts the public interest. *See F.T.C. v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997) (affidavit "lacking detailed facts and any supporting evidence[] is insufficient to create a genuine issue of material fact"), *as amended* (Apr. 11, 1997); *accord Hansen v. United States*, 7 F.3d 137, 138 (9th Cir. 1993) (per curiam).

Nearly a year after briefing had concluded, Paliador also moved to file a "Supplemental Opposition" to Platypus's motion consisting of over 100 pages of declarations, exhibits, and pleadings from Duggan and separate vessel owners in other litigation. Dkt. Nos. 47–48. Paliador fails to provide any legal authority supporting its motion for leave to file a supplemental opposition, and the Court finds such motion to be unsupported under either the Local Civil Rules or the Federal Rules of Civil Procedure. *See, e.g.*, *Allstate Indem. Co. v. Lindquist*, No. C20-1508-JLR, 2022 WL 1607925, at *2–3 (W.D. Wash. May 20, 2022).

Wash. May 30, 2023) (granting summary judgment where "the events at issue are private in nature" and plaintiff failed to establish public interest element of CPA claim); *Jet Parts Eng'g, Inc. v. Quest Aviation Supply, Inc.*, No. C15-0530-RSM, 2015 WL 4523497, at *4 (W.D. Wash. July 27, 2015) ("[T]o establish the public interest element, there must be a real and substantial potential for repetition[.]"); *Kazia Digo, Inc. v. Smart Circle Int'l, LLC*, No. C11-544-RSL, 2012 WL 836233, at *3 (W.D. Wash. Mar. 12, 2012) ("Often a breach of private contract affects only the parties to the contract and therefore does not qualify as an act or practice that affects the public interest.").

## III.   CONCLUSION

For the foregoing reasons, the Court GRANTS IN PART AND DENIES IN PART Platypus's motion for summary judgment, Dkt. No. 31, and DENIES Paliador's motion for leave to file supplemental opposition, Dkt. No. 47. No later than October 15, 2024, the parties are directed to meet and confer and to submit a joint status report proposing a scheduling order for trial. *See* Dkt. No. 46-1 at 2 (case scheduling template).

Dated this 24th day of September, 2024.

Lauren King
United States District Judge